IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ALEXANDRA WOLF, et al.,         )
                                )
      Plaintiffs,               )
                                )
      v.                        )   1:06cv945 (JCC)
                                )
FAUQUIER COUNTY BOARD OF        )
SUPERVISORS, et al.             )
                                )
      Defendants.               )                    _____

### M E M O R A N D U M   O P I N I O N

This matter comes before the Court on Defendants'
Motions for Summary Judgment.  For the following reasons, the
Court will grant the Motions.

### I.  Background

Plaintiffs Alexandra Wolf ("Wolf") and her two
children, Rachel, and C.J. Wolf ("children"), have brought this
action to recover for alleged violations of their constitutional
rights arising from alleged removal of the children from Wolf's
custody, and other actions taken by the Fauquier County
Department of Social Services ("DSS").  Plaintiffs have brought
action against the Fauquier County Board of Supervisors, as well
as Mimi deNicolas ("deNicoloas"), Stephanie Duncan ("Duncan"),
LaTeeka Tutwiler ("Tutwiler"), Beth Stephens ("Stephens"),
Elizabeth Stevenson ("Stevenson") and Chrysalis Counseling

Center, P.C. ("Chrysalis").  The facts, as alleged by Plaintiffs,
are as follows.

In August 2005, Wolf was suffering from panic attacks,
and sought treatment at Chrysalis with Stephens, a life coach.
Stevenson, the sole shareholder and executive director of
Chrysalis, reviewed Wolf's contact sheet and, noting the
referenced "anxiety/panic," advised that Stephenson explore the
possible need for other clinical services with Wolf.  Stephenson
first met with Wolf on August 3, 3005, and advised her of the
possible need for medication and offered to have a psychiatrist
write a prescription.  Wolf declined medication and did not
pursue an appointment with a psychiatrist, and the sessions with
Stephenson continued.  Stevenson met regularly with Stephens to
review Wolf's case, and again recommended that Wolf see a
psychiatrist.  On August 10, 2005 Stephens again encouraged Wolf
to see a psychiatrist, but Wolf declined.

On August 17, 2005, Wolf informed Stephens during a
session of the stress she was currently undergoing, and described
how she had, in the past, considered suicide.  Wolf specified
that she was not currently considering suicide and did not intend
to harm herself or her children.[1]  Stephens was aware of an

---

[1] At this point, the facts are highly disputed.  Stephens claims that
Wolf directly described a plan to kill herself and her children by carbon
monoxide poisoning on or about November 1, 2005, while Wolf disputes this
assertion and claims that the discussion related only to past thoughts.  For
the purposes of summary judgment, the Court will construe these disputed facts
in the light most favorable to Wolf, the non-movant.

ethical obligation to report threats of harm to children to DSS, and after the conversation, Stephens sought advice from Dr. Mark Simonds ("Simonds").[2]  Dr. Simonds advised her to have Wolf sign a "No-Harm Contract" promising not to harm her children, contact her direct supervisor Stevenson and, pursuant to the reporting requirement, notify DSS.

After this conversation, Stephens contacted Stevenson and informed her that Wolf planned to kill herself and her children by carbon monoxide poisoning.  Stevenson advised her to contact DSS.  She then contacted the Fauquier County Sheriff's Office ("Sheriff's Office") and deNicolas at the DSS and informed them that Wolf was contemplating suicide and was a threat to her children.  Once aware of this complaint, Wolf contacted her attorney, David Silek ("Silek") and asked for his assistance. Silek contacted the Sheriff's Office and convinced the Office to terminate its investigation, and that Wolf posed no threat to herself or her children.  The next day, two DSS social workers – Tutwiler and Duncan – were sent to the Wolf residence.  When they arrived, Wolf greeted them at the door with her attorney Silek on the phone.  Silek spoke to deNicolas, the program manager for DSS and immediate supervisor of Tutwiler and Duncan, and informed her that Wolf was not suicidal and posed no threat to her children.

---

[2]Dr. Simonds was named as a Defendant in the instant action, but dismissed by Order dated July 10, 2007.

After meeting with the social workers, Wolf signed a form permitting the children to be placed with a friend pending an additional meeting with the social workers, but noted a written objection.  Wolf and Silek then met with the social workers the next morning, and explained why they believed the information given to the DSS was false.  The social workers then informed Wolf that the children would be returned if she was cleared by a psychiatrist.

The social workers filed a petition in Fauquier County Juvenile & Domestic Relations Court ("JDRC") for a protective order, which was granted after an *ex parte* hearing on September 2, 2005, at which Stephens testified.  On September 9, 2005 an agreement was entered into, allowing for continued appointment of the guardian *ad litem*, department of social services interviews with the children, and submission to a psychiatric examination by Wolf.  The guardian *ad litem* did not file his report until April 2006, at which time the representative of DSS requested that his appointment be continued, a request the court declined.

On August 16, 2006 Plaintiffs filed the instant action. On October 16, 2006 this Court dismissed claims for malicious prosecution and civil conspiracy.  Plaintiffs then amended the complaint.  On December 12, 2007 this Court dismissed the malicious prosecution claim from the amended complaint.  On July 10, 2007 this Court dismissed Dr. Simonds as a defendant.  The

4

remaining Defendants then filed motions for summary judgment. These motions are currently before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996)(citations omitted).

A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. *See id.* at 255. Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier

of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 248-52. Rather, the Court must determine whether the record as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248.

### III. Analysis

A) Claims Against Stephens, Stevenson, and Chrysalis

1) Immunity

Virginia law strongly favors the reporting of suspected child abuse,[3] and in some cases imposes a mandatory duty to report. *See* Virginia Code § 63.2-1509. For licensed clinical social workers, who fall under this category, failure to report suspicion of child abuse or neglect within seventy-two hours may result in a fine of up to $500.00. *Id.* The Virginia Code also includes a catchall provision permitting report by persons who do not fall within the enumerated mandatory reporting categories of § 63.2-1509, which states that "[a]*ny person* who suspects that a child is an abused or neglected child *may make a complaint*

---

[3]In its definition of "abused or neglected child," the Virginia Code explicitly includes children whose parents "threaten[] to create or inflict" physical or mental injury as well as children that have already been harmed. Virginia Code §63.2-100.

concerning such child." Virginia Code § 63.2-1510 (emphasis added). In either case, any person making a report or complaint is immune from civil or criminal liability "unless it is proven that such person acted in bad faith or with malicious intent." Virginia Code § 63.2-1512.

Plaintiffs do not allege that Stephens and Stevenson acted with "malice" or intent to harm Wolf in reporting the incident to Social Services. However, the statute offers two grounds for defeating a claim for immunity: when the reporter acts with malicious intent or in "bad faith." The fact that the Virginia General Assembly used two different standards suggests that "bad faith" is not synonymous with "willful and malicious." *See Trident Perfusion Assoc., Inc. v. Lesnoff,* 121 F.3d 700 (4th Cir. 1997). The Virginia General Assembly has not directly defined "bad faith" in the context of § 63.2-1512. In Virginia, "[i]f [a statute's] language is clear and unambiguous, there is no need for construction by the court; the plain meaning and intent of the enactment will be given it." *Mejia v. Commonwealth*, 474 S.E.2d 866, 869 (Va. Ct. App. 1996) (quoting *Brown v. Lukhard*, 330 S.E.2d 84, 87 (1985)). In construing the meaning of "bad faith" and "good faith," Virginia Supreme Court decisions have emphasized objective reasonableness rather than focusing on subjective intent. *See, e.g., County of Prince William v. Rau*, 391 S.E.2d 290, 292 (Va. 1990) (applying an "objective standard

of reasonableness" in determining statutory good faith); *Tullidge v. Board of Supervisors*, 391 S.E.2d 288, 290 (Va. 1990) (finding an attorney has acted in bad faith if, "after reasonable inquiry, [he] could not have formed a reasonable belief" in the success of a claim); *CUNA Mut. Ins. Soc'y v. Norman*, 375 S.E.2d 724, 726-27 (Va. 1989) (applying a reasonableness standard to evaluate an insurer's bad faith); *Aetna Casualty & Surety Co. v. Price*, 46 S.E.2d 220, 228 (Va. 1966) (in insurance case, describing bad faith as a more stringent standard than negligence, and good faith as dependent upon the insurer keeping "both its own and the insured's interests in mind").  The Virginia Supreme Court has denied the argument that "bad faith" requires a showing of "fraud, deceit, dishonesty, malice, or ill-will," instead requiring a demonstration that the party accused of bad faith "acted in furtherance of its own interest, with intentional disregard of the .. interest of the" other party.  *State Farm Mut. Auto. Ins. Co. v. Floyd,* 366 S.E.2d 93, 97 (Va. 1988).  Additionally, the Court held that it was an error for the trial court to require only a preponderance of the evidence standard for proving bad faith.  *Id.* at 98.  Instead, because bad faith requires proving more than mere negligence, Virginia law requires that plaintiffs overcome the presumption of good faith "by clear and convincing evidence."  *Id.*  Accordingly, this Court concludes that the appropriate inquiry for bad faith under the Virginia

reporting statute is to ask whether Defendants' actions were objectively unreasonable and demonstrated intentional disregard of Plaintiffs' interests.

In the instant action, the parties agree that a conversation occurred between Stephens and Wolf, after which Stephens perceived a threat by Wolf to harm her children.  While the parties dispute the actual context of the conversation and Stephens's response, it is undisputed that Stephens believed Wolf intended to harm her children and conveyed that exact message to both Simonds and Stevenson, who each advised her of the Virginia Code's mandatory reporting requirement.

Even taking the facts in the light most favorable to the Plaintiffs, this Court cannot conclude that Stevenson acted unreasonably in advising Stephens to report the incident to DSS. Plaintiffs' evidence shows that Stephens contacted Stevenson for advice on how to proceed, and represented to her that Wolf had affirmatively told her she intended to kill herself and her two children.  She had known Stephens for years, and had no reason to distrust the accuracy of her statement.  (Stevenson Dep. at 63-65).  Regardless of what transpired between Stephens and Wolf, Stephens did not report a vague statement about suicidal fantasy to Stevenson, but a specific plan to kill herself and her children.  Stevenson was aware that she and Chrysalis were under an ethical and legal obligation to report such a danger of child

abuse to DSS, and advised Stephens to do so.  The Court does not
find such behavior to be "objectively unreasonable."  Rather,
this decision was a judgment call made in the best interests of
the Wolf children, whom Stevenson had reason to believe were in
danger--one that Stevenson felt legally obligated to make.
Finally, the Court believes that this decision comports with the
goals of the Virginia General Assembly when it passed the
immunity statute.  Therefore, the Court finds that Stevenson and
Chrysalis are entitled to immunity under the Virginia Code.  This
finding provides immunity from all civil liability arising from
the report.  For that reason, summary judgment is granted to
Defendants Elizabeth Stevenson and Chrysalis as to the claims of
negligence,  defamation, breach of contract of confidentiality,
and intentional infliction of emotional distress.

       Stephens heard Wolf's comments and was the one to make
the report to DSS.  There is some evidence that she ignored
Wolf's attempts to correct a misunderstanding, and that she
changed her records of the conversation after the fact.  However,
Plaintiffs have produced not evidence to suggest that Stephens
was acting only in furtherance of her own interest and with
complete disregard for Plaintiffs' interests.  Instead, she
demonstrated concern for the welfare of the Wolf children, and,
even though she knew she would lose a client, called DSS.  Even
viewing the evidence in the light most favorable to the non-

moving party, Plaintiffs have failed to demonstrate clear and convincing evidence that Stephens actions rise to the level of intentional disregard for Ms. Wolf and were thus objectively unreasonable.  For that reason, she is entitled to immunity from all civil liability arising from the report, and summary judgment is granted to Beth Stephens as to the claims of negligence, defamation, breach of contract of confidentiality, and intentional infliction of emotional distress.

    2) <u>Medical Malpractice</u>

To state a cause of action for medical malpractice in Virginia, a plaintiff must plead: (1) existence of a legal duty, (2) a breach of that duty, and (3) that this breach proximately caused plaintiff's injuries. *Delk v. Columbia/HCA Healthcare Corp.,* 523 S.E.2d 826, 830 (Va. 2000). A legal duty only exists when a physician-patient relationship is present, and such a relationship arises from "a consensual transaction, a contract, express or implied, general or special." *Lyons v. Grether,* 239 S.E.2d 103, 105 (Va. 1977); *see also Didato v. Strehler,* 554 S.E.2d 42, 47 (Va. 2001). Whether this relationship was created turns upon "a determination whether the patient entrusted his treatment to the physician and the physician accepted the case." *Lyons,* 239 S.E.2d at 105.

Plaintiffs allege that Stevenson was the health care provider responsible for the clinic's relationship with Ms. Wolf,

and thus that there was a physician-patient relationship. Under Virginia Law, "a physician's liability for malpractice is predicated upon an initial finding that a consensual agreement exists between physician and patient, establishing a relationship from which flows the physician's duty of care." *Harris v. Kreutzer*, 271 Va. 188, 198 (Va. 2006). The question of creation of such relationship is one "of fact, turning upon a determination whether the patient entrusted his treatment to the physician and the physician accepted the case." *Lyons v. Grether*, 218 Va. 630, 633 (Va. 1977) (internal citations omitted). Plaintiffs do not dispute that Ms. Wolf never met Elizabeth Stevenson, but rest the determination of physician-patient relationship on the Stevenson's supervision of Beth Stephens and position at Chrysalis.

Insofar as Plaintiff's claims seek to hold Stevenson vicariously liable for Stephen's alleged misconduct, the claim is impermissible under Virginia's Medical Malpractice Act. Peck v. Tegtmeyer, 834 F. Supp. 903, 907 (W.D. Va. 1992) (citing Virginia Code §§ 8.01-581.1--.20). Plaintiffs also seek liability for Stevenson as the sole officer of Chrysalis. Virginia recognizes the creation of physician-patient relationships with health care organizations, rather than simply individuals. *Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 650 (4th Cir. 2004); *Didato v. Strehler*, 554 S.E.2d 42, 47 (Va. 2001).

12

Ms. Wolf came to Chrysalis seeking assistance with mental health needs.  She made an appointment with a life coach, and the contractual agreement she signed was for life coaching. She never saw another member of the staff for any kind of treatment or assistance, even turning down an offer of psychiatric assistance with medication.  There is no indication that there was a consensual agreement between Ms. Wolf and the entity of Chrysalis as a whole.

Plaintiff also alleges that, although Stevenson never met Ms. Wolf, she was making decisions about her through her supervision of Stephens.  The Virginia analysis imposes no physician-patient relationship "in the absence of proof that the doctor had accepted the patient, had consulted with a physician about the patient, or had been summoned for consultation or treatment" without an explicit agreement providing otherwise. *Prosise v. Foster*, 261 Va. 417, 423-424 (Va. 2001) (agreeing with and applying the analysis of *Rivera v. Prince George's County Health Dept.*, 649 A.2d 1212 (Md. Ct. Spec. App. 1994)).  In this case, Plaintiffs allege that the relationship between Stevenson and Stephens was supervisory, with Stephens consulting Stevenson in regard to the life coaching she gave to Wolf.  However, they do not provide any evidence that the consultations between Stevenson and Stephens were about provision of the type of treatment contemplated by the Medical Malpractice Act, except

13

insofar as Stevenson instructed Stephens to recommend a psychiatric consult.  The Act defines "health care" as "any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement."  Va. Code § 8.01-581.1.  The mere recommendation that a patient see another doctor is not in itself medical treatment.  Therefore, Plaintiffs have failed to demonstrate the existence of a physician-patient relationship.

Even if Stevenson's relationship with Wolf rises to the level of a physician-patient relationship such that a medical malpractice claim would be appropriate, to recover for medical malpractice in Virginia, "a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, the plaintiff must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death." *Bitar v. Rahman*, 630 S.E.2d 319, 323 (Va. 2006) (quoting *Bryan v. Burt*, 486 S.E.2d 536, 539-40 (1997)).

As this Court held in its opinion dismissing Dr. Simonds from this case, advising Stephens to report the conversation she had with Ms. Wolf to the Department of Social Services is not medical malpractice, but is merely giving non-medical professional advice.  Additionally, there are no grounds

14

on which to hold Stevenson responsible for what Stephens told the Department of Social Services regarding Stephens' opinion that Ms. Wolf might be psychotic.  Although "a physician, a nurse, or a hospital each may be held liable in their own right, there is no basis or reason for holding a physician liable for the conduct of another physician, a hospital nurse, or any other hospital employee" for medical malpractice under a theory of vicarious liability, in accordance with Virginia's Medical Malpractice Act. *Peck v. Tegtmeyer*, 834 F. Supp. 903, 907 (W.D. Va. 1992).

Wolf alleges that Stevenson was directly negligent and that it violated the applicable standard of care "not to have Ms. Wolf initially evaluated by a professional before assigning her to Stephens, to not disclose Stephens' unqualified status, [and] to permit Stephens to have repeated sessions with Wolf."  Pl.'s Resp. Br. at 38.  Although these claims are significant, in order for the Court to deny summary judgment, there must be evidence in the record for a reasonable finder of fact to find that the Defendant's negligence was the proximate cause of Plaintiff's injuries.  The link between Stevenson's alleged violation of the standard of care and the harm Ms. Wolf allegedly suffered because of the DSS investigation is simply too tenuous to support a finding of proximate cause.  For these reasons, summary judgment will be granted on the issue of medical malpractice.

   3) <u>Negligent Hiring</u>

15

The cause of action for negligent hiring under Virginia law "is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others." *Southeast Apts. Mgmt., Inc. v. Jackman*, 513 S.E.2d 395, 397 (Va. 1999) (citing *Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 911 (Minn. 1983)). Parties will be held liable "for consequences that, in view of the circumstances, could reasonably have been anticipated by a prudent person, but not for casualties which, though possible, were wholly improbable. A party is not charged with foreseeing that which could not be expected to happen." *Interim Pers. of Cent. Va., Inc. v. Messer*, 559 S.E.2d 704, 708 (Va. 2002) (internal citations omitted). Instead, the standard is "that an ordinary, prudent person ought, under the circumstances, to have foreseen that an injury might probably (not possibly) result from the negligent act." *Id.* (citing *Blondel v. Hays*, 403 S.E.2d 340, 345 (1991)). In addition, the risk of harm contemplated by the doctrine has generally been held to be a threat of serious physical injury. *See, e.g., Parker v. Geneva Enters.,* 997 F. Supp. 706 (E.D. Va. 1997) ("Plaintiff's claim for negligent hiring must dismissed as Virginia law would not recognize such a claim based on the alleged facts where the alleged conduct ... did not involve serious and significant

16

physical injury"); *Investors Title Ins. Co. v. Lawson*, 68 Va. Cir. 337, 338 (Va. Cir. Ct. 2005).   Plaintiffs do not claim that Stephens posed physical danger to Ms. Wolf, but that her training or licensing were insufficient.   Evidence of failure to meet a training or educational standard does not come close to rising to the level where it is foreseeable that injury would result. *Martha Clements v. MCV Associated Physicians*, 61 Va. Cir. 673, 677 (Va. Cir. Ct. 2002) ("Failure to pass the Board exams in and of itself is not an indication that a person has a known propensity for dangerous activity.").   Because there is no evidence that Chrysalis knew or should have known of any reason why Stephens posed an unreasonable risk of harm to others, summary judgment will be granted to Defendants on this claim.

4) Negligent Supervision

There is no definitive authority in Virginia for a negligent supervision claim.   The Virginia Supreme Court stated that "[i]n Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances and we will not create one here."   *Chesapeake & Potomac Tel. Co. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). Although other state courts have included language suggesting the possibility that there might be circumstances where it might be appropriate to find a duty to supervise, they have not so found. *See, e.g., Johnson-Kendrick v. Sears, Roebuck & Co.*, 39 Va. Cir.

17

314, 319 (Va. Cir. Ct. 1996) (stating that although the Virginia
Supreme Court "made it clear that there was no duty to supervise
which arose under the circumstances presented in that particular
case[, t]he court did not opine that there would never be a
situation in which an employer would have a duty to supervise an
employee," but failing to apply any such duty); *see also J. v.
Victory Tabernacle Baptist Church,* 372 S.E.2d 391, 392-393 (Va.
1988)("appellant failed to submit any authority either on brief
or in oral argument concerning negligent supervision").  The only
cases cited by Plaintiffs suggesting the possibility of recovery
for negligent supervision failed to address the existence of such
cause of action in tort under Virginia law, but rather found
breach of contractual supervision.  Pl. Resp. Br. at 44-45
(citing *Comptroller of Virginia ex rel. Virginia Military
Institute v. King,* 232 S.E.2d 895, 901 (Va. 1977*)* and *Nelson v.
Commonwealth*, 368 S.E.2d 239, 252 (Va. 1988)).

Because Plaintiffs cite no authority for a duty to
supervise in Virginia, summary judgment is appropriate and will
be granted to Defendant.

5) Piercing the Corporate Veil

In order to pierce the corporate veil in Virginia, "the
plaintiff must show that the corporate entity was the alter ego,
alias, stooge, or dummy of the individuals sought to be charged
personally and that the corporation was a device or sham used to

18

disguise wrongs, obscure fraud, or conceal crime." *Cheatle v.
Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987).
The Virginia Supreme Court "has been very reluctant to permit
corporate veil piercing. We have made it clear that only an
extraordinary exception justifies disregarding the corporate
entity in order to hold individual stockholders personally liable
for a judgment against the corporation." *Dana v. 313 Freemason,
A Condo. Ass'n*, 587 S.E.2d 548, 554-555 (Va. 2003) (internal
citations omitted) (finding it appropriate to pierce the
corporate veil in a corporation formed "merely to avail
[Defendants] of a shield against their potential liability for
the known defects.").

The first prong of the *Cheatle* test requires Plaintiff
to demonstrate that Chrysalis was the alter ego of Beth
Stevenson.  The Fourth Circuit laid out a number of factors which
are to be given weight in the consideration, including

> whether the corporation was grossly
> undercapitalized for the purposes of the
> corporate undertaking, ...  failure to
> observe corporate formalities, non-payment of
> dividends, the insolvency of the debtor
> corporation at the time, siphoning of funds
> of the corporation by the dominant
> stockholder, non-functioning of other
> officers or directors, absence of corporate
> records, and the fact that the corporation is
> merely a facade for the operations of the
> dominant stockholder or stockholders.

*De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540
F.2d 681, 686-687 (4th Cir. 1976).  However, none of these

19

factors is dispositive.  Instead, the Fourth Circuit emphasized that "[t]he conclusion to disregard the corporate entity may not, ... rest on a single factor, ... but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness."  *Id.* at 687.

Plaintiffs argue that Chrysalis failed to maintain adequate liability insurance, and as such should be considered undercapitalized.  Chrysalis did not have liability insurance as an entity, but relied upon insurance purchased by each of the individual licensed professional employees.  Undercapitalization occurs when a corporation fails to "maintain[] liability insurance at a level commensurate with its business operations." *Depaoli v. Vacation Sales Assocs., LLC*, 425 F. Supp. 2d 709, 716 (E.D. Va. 2005).  Defendants argue that the insurance held by the individuals is adequate to cover its business operations, and that it attempted to obtain further insurance for a life coach but found it unavailable.  Unlike a corporation held to have "woefully inadequate capitalization" because it could not cover predictable risks of its business, there is not evidence that Chrysalis's failure to maintain insurance as an entity means that it is grossly undercapitalized to the extent that it would be unable to cover its predictable risks.  *West v. Costen*, 558 F. Supp. 564, 586 (W.D. Va. 1983).  Plaintiffs also mischaracterize *De Witt* as holding that failure to pay a dividend is "persuasive

proof of [undercapitalization]." Pl. Resp. Br. At 54. Instead, the Fourth Circuit held that "*inability* of the corporation to pay a dividend is persuasive proof of this want of capital." *De Witt*, 540 F.2d at 688 (emphasis added). Plaintiffs have produced no evidence that Chrysalis was unable to pay a dividend, merely that it has not done so. Even if Chrysalis's insurance were to be considered inadequate and the corporation undercapitalized, Plaintiffs fail to produce evidence that the alleged undercapitalization "present[s] an element of injustice or fundamental unfairness" and thus fail to meet the first prong of the *Cheatle* test. *Id.* at 687.

Although Plaintiffs assert that they "do not allege that Chrysalis Counseling Center is merely 'a device or sham used to disguise wrongs, obscure fraud, or conceal crime,'" they argue that alleged misrepresentations by Chrysalis are sufficient to rise to the level of "allow[ing] a gross injustice." Pl.'s Interrog.; Pl. Resp. Br. at 50 (citing *Puamier v. Barge Bt* 1793, 395 F. Supp. 1019, 1029 (E.D. Va. 1974) (applying Florida law to find it appropriate to pierce the corporate veil upon misrepresentation by Defendant and other evidence that the corporations in question were formed as "shields for his personal dealings")). This Court cannot agree with Plaintiffs' assertion that Virginia law "permits the corporate identity to be disregarded where *any* misrepresentation by the individual

controlling the company has been made upon which another party
has relied," (Pl. Resp. Br. at 50, (emphasis added)) as it does
not comport with the Virginia Supreme Court's strong language
expressing the rare situations in which it is appropriate to
pierce the corporate veil.  Because Plaintiffs' have failed to
provide evidence that demonstrates, even when viewed in the light
most favorable to them, that Chrysalis was incorporated "to
disguise wrongs, obscure fraud, or conceal crime," this Court
finds that they do not meet the second prong of the *Cheatle* test.
Therefore, summary judgment must be awarded to the Defendants and
Elizabeth Stevenson will not be held vicariously liable as the
alter ego of Chrysalis.

     <u>B) Claims Against Defendants Fauquier County Board of
Supervisors, Mimi deNicolas, Stephanie Duncan, and
Lateeka Tutwiler</u>

       1) <u>Fauquier County's Municipal Liability</u>

Municipalities can "be held liable for constitutional
violations committed by their employees where the municipality is
itself responsible for causing the constitutional deprivation."
*Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)
(citing *Monell v. New York City Dep't of Social Services*, 436
U.S. 658, 694 (1978)).  Plaintiff is seeking to hold Fauquier
County Board of Supervisors liable for DSS employee's actions.
In order to do so, Plaintiffs must demonstrate that the Fauquier

22

County Board of Supervisors is itself responsible for the constitutional deprivation, because  "[m]unicipalities cannot be held liable under a theory of respondeat superior for the constitutional violations of their employees acting within the scope of their employment."  *Gedrich v. Fairfax County Dep't of Family Servs.*, 282 F. Supp. 2d 439, 471 (D. Va. 2003) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987)). Therefore, in order to impose § 1983 liability on a municipality, plaintiffs must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights."  *Id.*  The Court emphasized that "neither a policy or custom of deficient training nor the required causal connection can be shown by proof of a single incident of unconstitutional activity alone," but requires significant further evidence.  *Id.* at 341 (internal citations omitted).

Although Plaintiffs allege that Defendants have a policy of assuming the truth of child abuse allegations without verification, they only provide evidence that DSS did not independently verify the allegations in this case, not that this lack of investigation into the claims has occurred in other instances.  Plaintiffs also produce a long list of what they consider to be violations of state and local legal requirements by the Fauquier County DSS.  (Pl. Resp. Br. at 26-30).  However,

23

each item is a description of how Defendants deNicolas, Duncan, and Tutwiler failed to meet requirements in their individual capacity and in this particular instance, not examples of how a municipality policy or custom caused any deprivation of Plaintiffs' rights.  Plaintiffs provide no evidence of multiple incidents that could lead the Court to find any municipal policy or a custom of deficient training.

Even viewing the facts in the light most favorable to the non-moving party, there is not sufficient evidence to demonstrate that Fauquier County Board of Supervisors was responsible for any policy or custom of improper training that caused deprivation of constitutional rights.  Therefore, it cannot be held responsible for constitutional violations committed the DSS workers.

2) Qualified Immunity

Defendants deNicolas, Duncan, and Tutwiler argue that they are entitled to qualified immunity as government officials. The Fourth Circuit has defined qualified immunity as shielding "[g]overnment officials performing discretionary functions" against "civil liability to the extent their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Fourth Circuit has explicitly

24

delineated a condensed analysis addressing qualified immunity claims for purposes of summary judgment: the trial court "can combine the second prong of the constitutional inquiry and the first prong of the immunity inquiry by asking whether the plaintiff has 'alleged the violation of a clearly established constitutional right.' If the answer is affirmative, the court must determine whether the defendant 'knew or should have known' that his conduct was illegal." *Pittman v. Nelms*, 87 F.3d 116, 119 (4th Cir. 1996) (quoting *Siegert v. Gilley*, 500 U.S. 226, 231 (1991) and *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995)).

Following the Fourth Circuit's condensed qualified immunity analysis for summary judgment, this Court will consider each of Plaintiffs' constitutional claims in turn to determine the applicability of qualified immunity to each claim.

i) <u>False Imprisonment</u>

To prevail on a claim of false imprisonment, Plaintiffs must demonstrate that the Wolf children were held without probable cause. *See, e.g., Street v. Surdyka*, 492 F.2d 368, 372-373 (4th Cir. 1974) ("there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause."), *Andreozzi v. Brooke County Comm'n*, 2007 U.S. Dist. LEXIS 58497, 12-13 (D. W. Va. 2007) ("[c]laims of ... false imprisonment may be defeated by showing a sufficient legal excuse, probable cause, to restrain the plaintiff's liberty"),

*Martin v. Tex. Dep't of Protective & Regulatory Servs.*, 405 F. Supp. 2d 775, 794 (D. Tex. 2005) (applying the probable cause standard to a claim of Fourth Amendment false imprisonment in a case of child removal by state child protective services).  The Eighth Circuit considered a similar case alleging that the state was liable for false imprisonment when state authorities removed a minor child from his parent's custody.  *K.D. v. County of Wing*, 434 F.3d 1051 (8th Cir. 2006).  The Court held that the emergency removal of the child from the home was permitted by the constitution because "in light of the facts known to the officers at the time, it was reasonable for [the officers] to conclude that they were presented with a situation where a child's welfare was imminently threatened." *Id.* at 1056.  Therefore, in order for Plaintiffs in this case to meet the first prong of the *Pittman* analysis, they must show evidence that the DSS workers who instituted the emergency safety plan did not reasonably believe the children's welfare was threatened.

Plaintiffs agree that the social workers acted reasonably in coming to the house to investigate the claim.  They assert, however, that the children were improperly removed into the custody of DSS through the implementation of an emergency safety plan which had the children stay with a neighbor for the night, and that such removal constitutes false imprisonment. After receiving the report of suspected child endangerment,

26

social workers visited the Wolf home.  Upon being told they could not enter the Wolf home or interview the children to ascertain their safety, they created a safety plan to ensure that the children would not be in any danger until further follow up could occur.  The plan was signed by Ms. Wolf and Defendants assert that it was also agreed upon by her attorney, who was on the phone with Ms. Wolf when she signed it.  Defendants assert that implementation of the safety plan did not constitute removal because it received parental approval and the children were not placed in DSS custody or otherwise removed entirely from the custody of the parent.  Ms. Wolf disagrees, asserting that she only signed the safety plan under threat of having her children removed to foster care, and further alleging that Defendant social workers told her she could have no contact with the children.

Plaintiffs allege that the Defendant social workers' conduct was unreasonable because it violated a Virginia statute. Insofar as they are relying on violation of state law to demonstrate false imprisonment or due process violation, the Fourth Circuit has "firmly dismissed ... the contention that a section 1983 action might rest on a violation of state law." *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988)(citing *Street v. Surdyka*, 492 F.2d 368, 371 (4th Cir. 1974)); *see also Weller v. Department of Social Services*, 901 F.2d 387, 392 (4th Cir. 1990).

27

Most of the alleged violations of state law occurred after the alleged removal took place, including failure of the social workers to obtain a court order and failure to adequately investigate the validity of the abuse report and thus are not relevant to the reasonableness of the social workers' alleged false imprisonment.

In order to demonstrate false imprisonment, Plaintiffs must allege that the DSS workers removed the children from the home without probable cause.  The social workers came to the home to investigate a report of child endangerment from what they believed to be a mandatory reporter, and were not allowed to enter the house or interview the children.  Even presuming that the implementation of the emergency safety plan constituted removal, the social workers' belief that the children's welfare was threatened was not unreasonable.  Therefore, Plaintiffs have failed to demonstrate evidence of a violation of a constitutional right, and thus do not meet the first prong of the *Pitmann* analysis as to their claim of false imprisonment.

ii) <u>Due Process Regarding Removal and Deprivation</u>
<u>          </u>     <u>of Familial Relationship</u>

To a significant extent, Plaintiffs rest their allegations of denial of due process regarding failure to hold a removal hearing on violation of Virginia law.  As discussed above in reference to the false imprisonment claim, "violations of

state law cannot provide the basis for a due process claim."
*Weller*, 901 F.2d at 392 (citing *Clark v. Link*, 855 F.2d at 161).

To the extent that Plaintiffs assert a procedural due
process claim on a basis other than violation of state law,
Plaintiffs must demonstrate that "there exists a liberty or
property interest which has been interfered with by the State and
that the procedures attendant upon that deprivation were
constitutionally deficient." *Gedrich,* 282 F. Supp. 2d at 466-467
(quoting *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 (4th
Cir. 2002))(internal quotation omitted).  In cases of emergency
child removal, "the requirements of process may be delayed ...
provided that adequate post-deprivation process to ratify the
emergency action is promptly accorded." *Jordan by Jordan*, 15
F.3d at 343 (4th Cir. 1994) (internal citations omitted).
Therefore, Plaintiffs must demonstrate inadequate post-
deprivation process to succeed in showing a violation of a
constitutional right.

Plaintiffs allege that the Wolf children were removed
from the home into DSS custody without parental permission and
without the required emergency court order.  Defendants argue
that the implementation of the safety plan did not constitute
taking custody of the children, and thus that there was no
removal under state law which would require a court order.  In
considering a similar factual scenario, the Eighth Circuit found

29

that the removal of a child for a little more than twenty-four hours was a "relatively limited intrusion into the familial relationship [and] not so disproportionate to the potential risk to [the child]'s well-being as to rise to the level of a constitutional violation." *K.D.,* 434 F.3d at 1057. As in this case, the state's law required a judicial hearing within 72 hours of the removal, which dd not occur. However, the Court found that since the child was returned to his parent within that time frame, no hearing was necessary. *Id.* at 1056 n.6. Although the wording of the Virginia statute is somewhat different, mere difference in state statutory language does not create a constitutional right for the Wolf family that did not exist for the child in *K.D.*

　　　　To impose liability for substantive due process claims, the action in question "must be so ill-conceived or malicious that it shocks the conscience; mere negligence is insufficient." *Gedrich*, 282 F. Supp. 2d at 460 (internal quotations omitted). In child protection cases, "'removal [of] a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse' does not shock the conscience." *Id.* (quoting *Weller*, 901 F.2d at 391). Even presuming that having the Wolf children stay with a neighbor under the emergency safety plan constituted removal, the action does not shock the conscience because there had been a report of

30

suspected danger to children made by a presumed mandatory reporter.

Insofar as Plaintiffs are contending that the investigation following the initial alleged removal constitutes a substantive due process violation, the law is clear that "[w]hatever disruption or disintegration of family life the [family] may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation." *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125-1126 (3d Cir. 1997)(citing *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993)); *see also Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (stating a State duty to protect minor children); *Weller,* 901 F.2d at 391.

Plaintiffs have failed to allege the violation of a clearly established constitutional right to either procedural or substantive due process regarding the removal of the Wolf children or the process which followed.  The same analysis applies to the claim of denial of family relationship, and thus qualified immunity is appropriate with respect to those claims as well.

iii) Procedural Due Process: Protective Order

As mentioned above, a successful procedural due process claim requires Plaintiffs to demonstrate that "there exists a liberty or property interest which has been interfered with by

31

the State and that the procedures attendant upon that deprivation were constitutionally deficient." *Gedrich,* 282 F. Supp. 2d at 466-467 (internal quotation omitted).  Plaintiffs assert that Defendants unconstitutionally interfered with court proceedings by suppressing evidence that would demonstrate the falseness of the child abuse claims, knowingly providing false and misleading information to council and the guardian ad litem, and attempting to deprive Wolf of representation.

Although this Court in no way condones deceiving a court or tampering with the legal process, allegations that an individual included misleading information in an affidavit or failed to reach a parent's attorney in no way reach the level of State interference with a liberty right.  Plaintiffs make no allegations regarding the constitutional deficiency of the juvenile court system or the legal processes in place governing child abuse hearings.  Plaintiffs have failed to make a procedural due process claim.

### IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment.  An appropriate order will issue.


September 12, 2007                        /s/
Alexandria, Virginia              James C. Cacheris
                          UNITED STATES DISTRICT COURT JUDGE